# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE:**<br><br>**Any and all funds or other assets in Brown Brothers Harriman & Co. Account #8870792 in the name of Tiger Eye Investments Ltd.;**<br><br>**Any and all funds or other assets in any and all Accounts held at UBS AG and UBS Securities LLC, Stamford, CT, by or containing any interest held by or controlled by Daniel Valente Dantas and/or Veronica Valente Dantas, Opportunity Group, Opportunity Fund, Opportunity Unique Fund, including but not limited to Account #WA359025 and WA628069 in the name of Opportunity Fund;**<br><br>**Any and all funds or other assets in the following accounts at Brown Brothers Harriman (Luxembourg) S.C.A.: Account #6459648 in the name of Brown Brothers Harriman (Luxembourg) S.C.A. as Custodian for Opportunity Fund; Account #6459747 in the name of Brown Brothers Harriman (Luxembourg) S.C.A. as Custodian for Opportunity Fund FBO Opportunity Fund-Reserve; Account #6459606 in the name of Brown Brothers Harriman (Luxembourg) S.C.A. as Custodian for Opportunity Unique Fund, Inc.; Account #6450209 in the name of TPSA Investment Corporation.** | **Civil Action No.  08-mc-0807** |

## MEMORANDUM OPINION

Before the Court is the government's application for a 10-day temporary restraining order.[1]  To rule on that application, the Court must resolve a matter of first impression:  the

---

[1] The government has represented that it is no longer seeking restraint over the Brown Brothers Harriman accounts located in Luxembourg because it concedes that the Court has no jurisdiction to restrain those accounts.  See Transcript of March 3, 2009 Hearing at 3-5. Nonetheless, because the government previously sought -- and the Court previously entered -- a restraining order against the those accounts, the Court includes them in the caption of the case.

interpretation of a statute that gives federal courts jurisdiction to restrain property "subject to a foreign forfeiture or confiscation judgment."  28 U.S.C. § 2467(d)(3).  The Opportunity Fund ("Fund"), a target of the restraining order sought here, has objected to the government's application.  The Fund is restrained by three orders currently in place and would also be affected were the Court to grant the government's application for a new 10-day temporary restraining order.  The Fund objects on several grounds, including an argument that, given the relevant facts, the Court lacks jurisdiction under § 2467(d)(3) to issue a restraining order.  As described in the analysis below, the Court agrees.  Although the government makes strong policy arguments for the authority it seeks, ultimately it is asking this Court to provide what Congress -- for whatever reason -- failed to provide in the statute.  Hence, the government's application for a 10-day temporary restraining order is denied and the restraining orders now in place will again be dissolved.

## BACKGROUND

The government's application arises out of criminal proceedings pending in Brazil.  A general familiarity with those proceedings is helpful.  On July 4, 2008, several individuals, including Daniel Valente Dantas, were arrested in Brazil.  Affidavit of Ricardo Andrade Saadi ¶ 55.  The arrests triggered a far-reaching Brazilian investigation into various financial crimes allegedly committed by the arrested individuals and the entities they control.  Id. ¶¶ 55-56.  According to the Brazilian investigators, Mr. Dantas had created three funds -- including the Opportunity Fund -- to purchase several public companies being privatized in Brazil.  Id. ¶ 31.  One of those funds is located in Brazil and the other two, including the Opportunity Fund, are located "offshore."  Id. ¶ 33.  The investigation apparently uncovered facts suggesting that the

Opportunity Fund violated a host of Brazilian securities laws.  See id. ¶¶ 34-53.  The

investigation -- which appears to be ongoing -- has caused the Brazilian courts to issue three

restraining orders.  The first was issued in July 2008, while the other two were issued in late

February 2009.  None of those orders are final.  Nonetheless, on February 26, 2009, Rita M.

Glavin, the Acting Assistant Attorney General ("AAAG"), found "that it is in the interest of

justice to CERTIFY the request of the Government of the Federative Republic of Brazil for

enforcement of [those] three restraining orders."  See Memorandum in Support of United States's

Application for a Restraining Order ("Gov't App. Mem."), Exhibit 1.

    This Court became involved with this matter in late December 2008.  On December 23,

2008 and December 29, 2008, the government filed emergency applications for restraining orders

against the above-captioned entities.  The Court issued those restraining orders on December 30,

2008.  The government sought a third restraining order on January 9, 2009, which the Court

entered on January 15, 2009.  The applications, each of which relied on the Saadi Affidavit, were

filed ex parte by the government.  Each application assured the Court of its jurisdiction to enter

such orders under 28 U.S.C. § 2467(d)(3) and pursuant to 18 U.S.C. § 983(j)(1)(A).  But on

February 9, 2009, the Opportunity Fund filed an emergency motion to dissolve the restraining

orders.  The Fund argued that the Court lacked jurisdiction under § 2467(d)(3) to enter those

orders in the first place.  Moreover, even if the Court did have jurisdiction, the Fund contended,

the government and the Court did not follow the procedures set out in § 983(j) in issuing those

orders, as they were statutorily required to do.  And the Fund objected to the Court relying on ex

parte affidavits to which it had no way to respond.  The issues were fully briefed and the Court

held a motions hearing on February 18, 2009.  On February 24, 2009, the Court dissolved those

orders -- effective at 1:00 p.m. on February 27, 2009 -- because they were not issued in accordance with the procedures set out in § 983(j).  See Feb. 24, 2009 Order (dkt ent. #25).  The Court did not reach the Fund's other arguments at that time.

On February 27, 2009 -- but before the restraining orders dissolved -- the government filed a motion for a 10-day temporary restraining order pursuant to § 983(j)(3).  At the same time, the government filed an application for a longer-term restraining order pursuant to § 983(j)(1)(B).  The government no longer relies on the Saadi Affidavit to justify the restraining orders; instead, it relies on the Brazilian restraining orders and the AAAG's certification of them.  Also on February 27, 2009, the Court stayed the dissolution of its previous three restraining orders and ordered the Fund to respond by March 2, 2009.  The Court held a hearing on March 3, 2009 and provided each party with a final opportunity to submit briefs and to supplement the record by March 4, 2009, which they did.  Each party then also submitted additional information on March 5, 2009.  The record -- albeit hastily and somewhat sporadically compiled -- is now complete.

## ANALYSIS

### I.  Statutory Framework

The principal statute at issue is 28 U.S.C. § 2467.  It provides federal district courts with jurisdiction to consider applications filed by the United States on behalf of a foreign nation "seeking to enforce [a] foreign forfeiture or confiscation judgment as if the judgment had been entered by a court in the United States."  § 2467(c)(1).  The statute defines "foreign forfeiture or confiscation judgment" as "a final order of a foreign nation compelling a person or entity . . . to pay a sum of money representing the proceeds of an offense . . . or [] to forfeit property involved in or traceable to the commission of such offense."  § 2467(a)(2).

Section 2467(d)(3) was added as part of the U.S.A. Patriot Act in 2001.   <u>See</u> Pub. L. No. 107-56, § 323, 115 Stat. 392 (Oct. 26, 2001).  The text follows:

**(3) Preservation of property.--**

> **(A) In general.**--To preserve the availability of property subject to a foreign forfeiture or confiscation judgment, the Government may apply for, and the court may issue, a restraining order pursuant to section 983(j) of title 18, at any time before or after an application is filed pursuant to subsection (c)(1) of this section.

> **(B) Evidence.**--The court, in issuing a restraining order under subparagraph (A)--

>> **(i)** may rely on information set forth in an affidavit describing the nature of the proceeding or investigation underway in the foreign country, and setting forth a reasonable basis to believe that the property to be restrained will be named in a judgment of forfeiture at the conclusion of such proceeding; or

>> **(ii)** may register and enforce a restraining order that has been issued by a court of competent jurisdiction in the foreign country and certified by the Attorney General pursuant to subsection (b)(2).

> **(C) Limit on grounds for objection.**--No person may object to a restraining order under subparagraph (A) on any ground that is the subject of parallel litigation involving the same property that is pending in a foreign court.

The Patriot Act made several other changes to § 2467 as well.  The notice provisions in §§ 2467(b)(1)(C) and 2467(d)(1)(D) were amended to incorporate due process requirements.  Moreover, language was added to the definition of "final forfeiture or confiscation judgment" in § 2467(a)(2) to require "dual forfeitability" -- <u>i.e.</u>, requiring the acts forming the basis of the foreign judgment to be illegal under both foreign and U.S. law.  In amending the definition of "foreign forfeiture or confiscation judgment," however, the Patriot Act did not remove the

requirement that such a judgment be a "final order."

## II.  Interplay Between 28 U.S.C. § 2467(d)(3) and 18 U.S.C. § 983(j)

In dissolving the restraining orders on February 24, 2009, this Court addressed the interplay between 28 U.S.C. § 2467(d)(3) and 18 U.S.C. § 983(j).  The Court examined the plain language of § 2467(d)(3), which provides that "the court may issue[] a restraining order pursuant to section 983(j) of title 18."  The Court focused on the phrase "pursuant to," holding that it "requires the government and this Court to follow the procedures set out in § 983(j) when seeking and issuing restraining orders under § 2467(d)(3)."  Feb. 24, 2009 Order at 2 (citing Black's Law Dictionary 1250 (7th ed. 1999)).  The Court held that whatever the merits of the government's interpretation of the phrase -- "something like 'guided by the principles set forth in'" -- might be from a policy perspective, the statutory language was unambiguous.  Id. at 2.  Moreover, the Court noted that while "the provisions of § 983(j) do not mesh precisely with the restraining order contemplated under § 2467(d)(3)," the § 983(j) provisions certainly provided a workable procedure for issuing § 2467(d)(3) restraining orders.  Id. 2-3.  The Court adheres to its previously-articulated interpretation of the interplay between 28 U.S.C. § 2467(d)(3) and 18 U.S.C. § 983(j).  Because the government and this Court did not comply with the procedures set out in § 983(j) in issuing the previous restraining orders, those orders will again be dissolved.

In its current applications for first a 10-day and then a longer duration restraining order, the government has proceeded under § 983(j), which sets out three procedures for issuing restraining orders.  First, a court may issue a restraining order upon the government's filing of a civil forfeiture complaint.  See 18 U.S.C. § 983(j)(1)(A).  Second, a court may issue a restraining order upon the government's ex parte application, without notice or opportunity for a hearing, if

the court is persuaded "that there is probable cause to believe that the property with respect to which the order is sought is subject to civil forfeiture and that provision of notice will jeopardize the availability of the property for forfeiture."  Id. § 983(j)(3).  Third, a court may issue a restraining order, "effective for not more than 90 days, unless extended by the court for good cause shown," if it determines, "after notice to persons appearing to have an interest in the property and opportunity for a hearing," that there is a "substantial probability" that the government will prevail on the issue of forfeiture, that the property will not be preserved absent a restraining order, and that the need to preserve the property "outweighs the hardship on any party against whom the order is to be entered."  Id. § 983(j)(1)(B).

The government asks the Court to grant its application for a 10-day temporary restraining order pursuant to the second methodology outlined above -- i.e., pursuant to § 983(j)(3).[2]  The Fund responds that the government cannot meet the requirements of § 983(j)(3) because the property to be restrained is not "subject to civil forfeiture."  But the Court need not address that argument because, as discussed below, it agrees with the Fund that the Court lacks jurisdiction under § 2467(d)(3).

### III.  The Court's Jurisdiction Under 28 U.S.C. § 2467(d)(3)

Analysis of this statutory construction issue begins from the premise that statutes conferring jurisdiction on the federal courts should be "strictly construed."  See United States v. Central Eureka Mining Co., 357 U.S. 155, 178-79 (1958); Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1040 (D.C. Cir. 1986).  Moreover, "[t]he party invoking federal jurisdiction bears

_____

[2] For the longer duration restraining order it also seeks, the government proceeds under § 983(j)(1)(B).

the burden of establishing" that the court has jurisdiction to take the action it requests.  See Lujan

v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  And it is a "universally recognized rule of

the common law that, absent jurisdiction, a court can render no judgment . . . ."  Buckhannon Bd.

and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598, 633

n.6 (citations and internal quotations omitted).

Working from those premises, the Court must interpret whether 28 U.S.C. § 2467(d)(3)

confers jurisdiction to grant an application for a 10-day temporary restraining order in this case.

The parties have identified no prior court decisions addressing this issue, and this Court has

found none.  The applicable rules of statutory interpretation, however, are firmly established.  A

court "must first determine whether the statutory text is plain and unambiguous."  Calcieri v.

Salazar, 555 U.S. ___, No. 07-526, slip op. at 7 (Feb. 24, 2009) (citing United States v.

Gonzales, 520 U.S. 1, 4 (1997)).  To interpret the statutory text, courts begin by examining

statutory definitions.  See Burgess v. United States, 128 S.Ct. 1572, 1577 (2008) ("'Statutory

definitions control the meaning of statutory words . . . in the usual case.'") (quoting Lawson v.

Suwannee Fruit & S.S. Co., 336 U.S. 198, 201 (1949)); Stenberg v. Carhart, 530 U.S. 914, 942

(2000) ("When a statute includes an explicit definition, we must follow that definition, even if it

varies from that term's ordinary meaning.").  Courts should also look to the "'specific context in

which [statutory] language is used, and the broader context of the statute as a whole.'"  United

States v. Wilson, 290 F.3d 347, 353 (D.C. Cir. 2002) (quoting Robinson v. Shell Oil Co., 519

U.S. 337, 341 (1997)).  Unless giving full meaning to the statutory text is absurd, a statute is not

ambiguous.  Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (citing Hartford Underwriters Ins.

Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)).  "When the words of a statute are

unambiguous, then, this first canon is also the last:  'judicial inquiry is complete.'" <u>Connecticut</u> <u>Nat'l Bank v. Germain</u>, 503 U.S. 249, 254 (1992) (quoting <u>Rubin v. United States</u>, 449 U.S. 424, 430 (1981)).

To determine whether § 2467(d)(3) is ambiguous, the Court begins with the statutory definition.  Section 2467(d)(3)(A) grants district courts the jurisdiction to issue restraining orders "[t]o preserve the availability of property subject to a foreign forfeiture or confiscation judgment."  Section 2467(a) is the "definitions" section of the statute and it defines only two terms:  "foreign nation" and "forfeiture or confiscation judgment."  The latter term is defined in full as follows:

> **(2)** the term "forfeiture or confiscation judgment" means a final order of a foreign nation compelling a person or entity--
>
> > **(A)** to pay a sum of money representing the proceeds of an offense described in Article 3, Paragraph 1, of the United Nations Convention, any violation of foreign law that would constitute a violation or an offense for which property could be forfeited under Federal law if the offense were committed in the United States, or any foreign offense described in section 1956(c)(7)(B) of title 18, or property the value of which corresponds to such proceeds; or
> >
> > **(B)** to forfeit property involved in or traceable to the commission of such offense.

28 U.S.C. § 2467(a)(2).  According to the Fund, the definition of "forfeiture or confiscation judgment," coupled with the jurisdictional grant in § 2467(d)(3)(A), means unequivocally that U.S. courts only have jurisdiction to enter restraining orders based on foreign judgments if the foreign judgment is final.

The government responds that a foreign judgment need not be final because the jurisdictional grant applies when property is "subject to" a foreign judgment.  Under the

government's interpretation, the term "subject to" is prospective -- even under the plain statutory language of the term.  To support this interpretation, the government points out that other statutes using similar language are interpreted such that "subject to" is prospective.  See Government Post-Hearing Mem. ("Gov't Post-Hrg Mem.") at 7.  For example, 18 U.S.C. §§ 981(a)(1) and 1963(b) and 21 U.S.C. §§ 881(a) and 853(a) all use the term "subject to forfeiture," which courts interpret prospectively.  Id. (citing United States v. Riley, 78 F.3d 367, 368 (8th Cir. 1996); United States v. McKinney, 915 F.2d 916, 920 (4th Cir. 1990)).  But, if anything, these examples support the Fund, not the government.  The examples demonstrate that Congress does, on occasion, use the phrase "subject to forfeiture," which is meant prospectively.  Yet in § 2467, Congress has chosen to use a different phrase -- "subject to a foreign forfeiture or confiscation judgment" -- and has explicitly defined that phrase in § 2467(a)(2) to mean a final order.[3]  On the face of the statute, that definition applies to the later-added jurisdictional grant in § 2467(d)(3). Hence, the Court agrees with the Fund that § 2467(d)(3) by definition only grants jurisdiction for district courts to issue restraining orders based on final foreign judgments.[4]

---

[3] The government's references to dictionary definitions are unhelpful.  Because Black's Law Dictionary does not contain a definition for "subject to," the government provides the definition of "confiscable."  But that word contains the suffix "-able," and hence is almost by definition prospective.  The government also provides the definition of "subject" from Webster's II New Riverside University Dictionary.  But that term is too broad and multi-faceted to provide insight as to the precise legal question the Court addresses here.  Indeed, the dictionary definitions of "subject" in its adjective form, and the many examples of the use of "subject to," neither support nor definitively foreclose the prospective meaning the government urges.  See Webster's 3d New Int'l Dictionary 2275 (1993)

[4] The Brazilian restraining orders that the government relies upon in its application for a temporary restraining order do not qualify as "final" orders under the statutory definition of "forfeiture or confiscation judgment."  But those restraining orders likely would not meet that statutory definition even if Congress had not expressly included the requirement of a final order in the definition.  Section 2467(a)(2) defines "forfeiture or confiscation judgment" as an order "to

Such an explicit statutory definition would in most instances end the inquiry.  See Burgess, 128 S.Ct. at 1577; Stenberg, 530 U.S. at 942.  In this case, however, the government argues that the disposition required by the statute is absurd if the definition is taken literally.  The Court will therefore also examine the context of § 2467(d)(3) to determine whether the statute is nonsensical if interpreted literally.  See Lamie, 540 U.S. at 534; Wilson, 290 F.3d at 353.  The government contends that two provisions in particular -- §§ 2467(d)(3)(B)(i) and 2467(d)(3)(C) -- would be meaningless if a foreign forfeiture judgment must be final before a U.S. court has jurisdiction under § 2467(d)(3).  Section 2467(d)(3)(B)(i) sets out one kind of evidence a court may consider in ruling on a government application for a restraining order:

> **(B) Evidence.**--The court, in issuing a restraining order under subparagraph (A)--

>> **(i)** may rely on information set forth in an affidavit describing the nature of the proceeding or investigation underway in the foreign country, and setting forth a reasonable basis to believe that the property to be restrained will be named in a judgment of forfeiture at the conclusion of such proceeding . . . .

Section 2467(d)(3)(C) forbids a restrained entity from objecting "on any ground that is the subject of parallel litigation involving the same property that is pending in a foreign court."

According to the government, §§ 2467(d)(3)(B)(i) and 2467(d)(3)(C) cannot be reconciled with the statutory definition of "forfeiture or confiscation judgment" as requiring a final order.  Section 2467(d)(3)(B)(i) provides that a court may consider an affidavit describing a "proceeding or investigation underway" in a foreign country which sets forth "a reasonable basis

---

pay a sum of money," § 2467(a)(2)(A), or "to forfeit property," see § 2467(a)(2)(B).  Such orders to pay or forfeit are normally only entered at the conclusion of a proceeding.  A restraining order, in contrast, simply preserves the status quo, and hence is a temporary measure entered prior to the conclusion of a proceeding.

to believe that the property <u>to be</u> restrained <u>will be named</u> in a judgment of forfeiture <u>at the</u> <u>conclusion</u>" of the proceeding.  Similarly, § 2467(d)(3)(C) describes parallel litigation "pending in a foreign court."  Both sections, the argument goes, contemplate ongoing or pending proceedings.  But if a "forfeiture or confiscation judgment" must be final for a district court to have jurisdiction to issue a restraining order, then the government could never supply evidence under § 2467(d)(3)(B)(i) and the limitation on objections provision in § 2467(d)(3)(C) would be rendered surplusage.

The Fund proposes a way to reconcile the statutory definition of "forfeiture or confiscation judgment" with the seemingly forward-looking provisions of §§ 2467(d)(3)(B)(i) and 2467(d)(3)(C).  <u>See</u> Fund's Post-Hearing Mem. at 2.  The Fund hypothesizes a situation in which a foreign country has issued a final judgment of forfeiture or confiscation but enforcement of that judgment has become an issue.  A post-judgment proceeding could ensue in the foreign country.  During the pendency of that post-judgment proceeding, the foreign country might seek help from the U.S. government if assets in the United States could be used to effectuate the judgment.  Under the Fund's scenario, the U.S. government might, at that point, invoke § 2467(d)(3) and submit an affidavit under § 2467(d)(3)(B)(i) to support a restraining order as to specific property that is the subject of the post-judgment (<u>i.e.</u>, post-final order) foreign proceeding.  Similarly, the limitation on objections provision from § 2467(d)(3)(C) could be invoked if the entity to be restrained objected in the United States on the same grounds that have been raised in the post-judgment proceedings pending in the foreign court.  To be sure, read in isolation, §§ 2467(d)(3)(B)(i) and 2467(d)(3)(C) would seem to contemplate a broader application than the Fund proposes.  But coupled with the explicit statutory definition in

§ 2467(a)(2), the Fund's proposed reconciliation appears workable -- especially because post-judgment enforcement proceedings are not altogether uncommon.

The key question, then, is whether confining the statute to scenarios like the one suggested by the Fund renders § 2467(d)(3) absurd.  If so, then the Court must consult other canons of statutory construction, such as the legislative history.  Although there is no bright-line test for "absurdity," the Supreme Court has set forth several principles that help identify what is not absurd.  A construction resulting in an "awkward" or "ungrammatical" statute is not absurd to the point of ambiguity.  Lamie, 540 U.S. at 534.  Nor is an interpretation that renders some terms surplusage.  Id. at 535.  A statute is not absurd even if the literal language is an "apparent drafting error."  Id. at 530.  A statute that is narrower or broader than might at first blush seem sensible is likewise not absurd.  Maryland & D.C. Rifle & Pistol Ass'n v. Washington, 442 F.2d 123, 127 (D.C. Cir. 1971).  In any of these instances, the Supreme Court has observed, "[t]he remedy for any dissatisfaction . . . lies with Congress and not with this Court.  Congress may amend the statute; we may not."  Griffin v. Oceanic Constractors, Inc., 458 U.S. 564, 576 (1982).

If § 2467(d)(3) were construed literally, then courts would only have jurisdiction to issue restraining orders as part of post-judgment enforcement proceedings.  The government argues that this reading is so narrow as to render the statute a nullity.  Gov't Post-Hrg Mem. at 8.  But a statute is only a "nullity" when it "means nothing" or when it has "no purpose."  See Retail Clerks Int'l Ass'n Local No. 455, AFL-CIO v. NLRB, 510 F.2d 802, 805-06 (D.C. Cir. 1975).  Here, § 2467(d)(3) as written has some purpose, even if it is not as broad a jurisdictional grant as the government would like.  Nor is that purpose of § 2467(d)(3) inconsistent with the remainder of § 2467.  To be sure, the Court acknowledges the government's protests that it would be

-13-

preferable, from a policy perspective, to interpret the statute more broadly.  But statutes conferring jurisdiction on the federal courts must be strictly construed, see Central Eureka Mining Co., 357 U.S. at 178-79, and "[t]he party invoking federal jurisdiction bears the burden of establishing" that the court may take the action requested, see Lujan, 504 U.S. at 561.  Where, as here, Congress has provided a "definitions" section and explicitly defined the key term -- "forfeiture or confiscation judgment" -- to preclude the jurisdiction sought, that burden simply cannot be met.  When it comes to policy decisions, the Court must defer to the judgment of the political, law-making bodies that created the law.  Lamie, 540 U.S. at 542; Griffin, 458 U.S. at 576.

If statutory text is unambiguous, a court's construction of the statute is complete.  Courts need not -- indeed, they may not -- consult the legislative history in an attempt to divine Congress's intent.  See Connecticut Nat'l Bank, 503 U.S. at 254.  Hence, there is no cause here to resort to an assessment of the legislative history.  Nonetheless, the parties have on short notice compiled what little legislative history exists regarding § 2467(d)(3).  Using the term "legislative history" loosely, the record includes:  a paper presented by then-Assistant Chief of the Asset Forfeiture and Money Laundering Section of the Department of Justice, Stefan D. Cassella, at an International Symposium on Economic Crime on September 12, 2001; a letter from Daniel J. Bryant, then-Assistant Attorney General, to the Speaker of the House on September 25, 2001, attaching a draft bill and a section-by-section analysis of that bill; versions of the bills containing the language that ultimately became § 2467(d)(3), beginning with the introduction of H.R. 2979 on October 2, 2001 and ending with the passage of the Patriot Act on October 26, 2001; testimony from a Senate hearing on September 26, 2001; and a House Report, H. Rept. 107-250

(2001), describing certain statutory provisions that were ultimately incorporated into the Patriot

Act.

The record reveals that Mr. Cassella proposed language that was in most substantive

respects identical to what became § 2467(d)(3), except that his proposal explicitly granted district

court jurisdiction to issue restraining orders based on non-final foreign forfeiture or confiscation

orders.  Less than two weeks after Mr. Cassella's presentation, the Justice Department proposed a

bill to Congress that included language that was substantively identical to the final § 2467(d)(3)

language, but that omitted Mr. Cassella's language granting explicit jurisdiction to issue

restraining orders based on non-final foreign forfeiture or confiscation orders.  Over the course of

the next month, the language that ultimately became § 2467(d)(3) did not change materially.  In

other words, what the Justice Department proposed to Congress -- but not what Mr. Cassella

proposed in his presentation -- ultimately became law.  The House Report and the section-by-

section analysis by the Justice Department only shed minimal light on legislative intent.  The

House Report, for example, states that § 2467(d)(3) "amends [§ 2467(d)] to include a mechanism

for preserving property subject to forfeiture in a foreign country," and also refers to "pending"

forfeiture proceedings in a foreign court.  See H. Rep. 107-250 at 59.

This history is murky at best.  Some portions of the record, like Mr. Cassella's paper and

the Justice Department's proposed language, are not "legislative" history at all.  Other portions,

like the House Report's use of the word "pending," really only refer to the language in the statute

itself.  And although the House Report states that § 2467(d)(3) provides "a mechanism for

preserving property subject to forfeiture in a foreign country," that is hardly the kind of clear

statement of legislative intent that would warrant second-guessing the undeniable expression of

legislative intent contained in the statute itself.  Indeed, the term "subject to forfeiture" in the House Report is the very phrase Congress could have used in § 2467(d)(3) -- as it has in other statutes -- but chose not to.  Therefore, as in <u>Lamie</u>, "[t]hese uncertainties illustrate the difficulty of relying on legislative history here and the advantage of our determination to rest our holding on the statutory text."  540 U.S. at 542.

Hence, the Court holds that the plain language of the statute only confers jurisdiction on federal district courts when property is subject to a final foreign forfeiture or confiscation judgment.  This interpretation, while narrower than the government would like, is compelled by the governing unequivocal statutory definition and is neither absurd nor inconsistent with the other provisions of the statute.  The Court need not rely on any other canon of statutory construction to reach this conclusion.  Under this interpretation, it follows that this Court lacks jurisdiction to enter an order restraining property in this case because the three Brazilian orders are indisputably not final.  Indeed, the Fund correctly points out that the Court lacked jurisdiction to enter any restraining order in the first place.

## IV.  Whether the Court Should Decline to Register the Brazilian Orders

The Fund argues in the alternative that the Court should decline to grant the government's application even if it has jurisdiction.  <u>See</u> Fund's Opp'n to the United States's Application for a TRO at 14.  The Fund points out that the three Brazilian orders were all entered <u>ex parte</u> and that U.S. courts are rightly skeptical of <u>ex parte</u> proceedings.  The Fund also argues that under Brazilian law, its assets will not be released until the underlying criminal proceedings in Brazil are complete, which could take years.  The Fund also asserts that it would be inequitable to continue restraining its assets.  As the Fund points out, it did not remove assets from its UBS

accounts from July 2008 (when the first Brazilian restraining order was issued) through December 30, 2008 (when this Court first entered a restraining order).  Hence, the Fund avers, the government has made no showing that there is probable cause to believe that the availability of the Fund's assets for forfeiture will be jeopardized without a restraining order, see § 983(j)(3), or, put differently, that there is a real threat of immediate, irreparable injury, see Fed. R. Civ. P. 65(b).  Finally, the Fund notes that it has, as of the date of this Order, had its assets restrained for 68 days even though the government has not obtained a properly-issued restraining order.  Some of these arguments, if developed further, might provide an additional basis for denying the government's application.  Suffice it to say now that, as it stands today, the record is lacking.  For example, given the time constraints, both sides have submitted hastily-compiled explanations of Brazilian law regarding a restrained third-party's opportunity to be heard there.  The Court will not address these arguments further here because, as described in detail above, it has determined that it lacks jurisdiction.  Moreover, in the event this litigation continues on the government's application for a longer-term restraining order, the parties will no doubt supplement the record to provide a more informed basis for a decision on some of these issues.

## CONCLUSION

For the reasons described above, the Court lacks jurisdiction to grant the government's application for a 10-day temporary restraining order.  Therefore, that request is denied. Moreover, the Court has determined that it lacked jurisdiction to issue the restraining orders previously dissolved but now again briefly in place.  Those restraining orders, which the Court previously concluded were not issued in accordance with 28 U.S.C. § 2467(d)(3)(A) and 18 U.S.C. § 983(j), are dissolved effective at 1:00 p.m. on Tuesday, March 10, 2009.  A separate

order accompanies this opinion.

**SO ORDERED.**

_____/s/_____
JOHN D. BATES
UNITED STATES DISTRICT COURT

Date: March 9, 2009